NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Ronald J. Harris, | ) | No. CV 06-0755-PHX-GMS (ECV) |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Dora Schriro, et al., | ) | |
| Defendants. | ) | |

Plaintiff Ronald J. Harris, who was formerly confined in the Arizona State Prison system, filed this civil rights action against various officials of the Arizona Department of Corrections (ADC). The remaining Defendants—Schriro, ADC Director; Bartos, Warden at Arizona State Prison Complex (ASPC)-Lewis during the relevant time period; Linderman, Administrator of Pastoral Activities; Johnson, Deputy Warden ASPC-Bachman Unit during the relevant time period; and Suwinski, Contract Management Specialist at ASPC-Lewis during the relevant time period—move for summary judgment.[1] (Doc. #152.) Although the Court issued a Notice to Plaintiff pursuant to Rand v. Roland, 154 F.3d 952, 962 (9th Cir. 1998) (*en banc*), advising him of his

---

[1]This is Defendants' second Motion for Summary Judgment; the first was granted in part and denied in part. (Doc. #138.) The Court gave Defendants leave to file a second summary judgment motion because Plaintiff's Complaint stated a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA) but the Court's screening Order only identified the First Amendment claim. (Id.)

obligation to respond and granted Plaintiff an extension of time to file his response, Plaintiff did not respond. (Doc. ##155, 158.) The motion is ready for ruling.

The Court will grant the motion and terminate the action.

**I.    Procedural History and Summary of Motion**

In his Complaint, Plaintiff, who is Jewish, alleged that, he was denied regular kosher meals (Count I) and religious services (Count II). The Complaint seeks damages and injunctive relief. (Doc. #1.) The Court directed Schriro, Bartos, Johnson, Linderman, Suwinski, and Morrison[2] to answer Count I and dismissed Count II because it did not state a claim.

**A.    First Summary Judgment Motion**

Defendants' first motion for summary judgment addressed only the First Amendment claims. The Court noted that Plaintiff raised numerous complaints regarding the provision of kosher meals and that, on the one hand, Plaintiff asserted that Defendants "allege the state has a valid set of policies and procedures for kosher meals. Plaintiff agrees that this is so." (Doc. #138 at 7.) Thus, as to some allegations, Plaintiff appeared to claim that Defendants deviated from their valid policies. On the other hand, some of his allegations and his specific requests for relief appeared to ask for more stringent procedures than those required by ADC policy. In his request for relief, Plaintiff asks for "kosher food in approved recognized original kosher packaging only, unopened by [ADC] staff with [specified kosher symbols] on their packages. . . . Vegetables untouched by staff in any manner that I can wash myself." (Doc. #1 at 16.) The Court also noted that Plaintiff had confused the issues by agreeing that ADC policies are valid and simultaneously criticizing and complaining about some of them yet not specifically asking for changes, e.g. the cleansing of the oven and the heating of kosher foods with non-kosher foods. The Court separately addressed the different types of claims—deviations from policies and requests for modification of policies—and limited

_____

[2] Morrison, an employee of Canteen Correctional Services, Inc. (Canteen), was subsequently dismissed as a Defendant. (Doc. #115.)

the requests for modification of the ADC policies to those requests specifically set forth in the request for relief in the Complaint.

As to claims for violation of the First Amendment, the motion was denied regarding allegations that, in violation of ADC policies, Plaintiff was served meat and cheese items together and that he saw food items being prepared without saran barriers between the food and counter tops. It was denied as to claims for damages for failure to modify the kosher diet policy regarding food packaging and labeling and regarding the serving of uncut vegetables; the Court found that it could not determine on the record before it whether ADC would prevail on the third factor under Turner v. Safley, 482 U.S. 78, 89-91 (1987): the impact that accommodation of the asserted constitutional right would have upon guards, other inmates, and prison resources. And the Court determined that Defendants were not entitled to qualified immunity as to these allegations. (Doc. #138.)

Summary judgment was granted in all other respects. The Court dismissed Schriro and Bartos as to claims that Plaintiff's rights were violated by service and preparation of food in violation of ADC policies; Plaintiff provided no evidence to establish a link between their conduct and any alleged violation. The Court also dismissed Suwinski as to claims requesting modification of ADC policies; there was no evidence that she had any authority to modify ADC kosher-diet policies. Id.

Defendants moved for reconsideration of so much of the Order arguing that Plaintiff's claims for the modification of the kosher diet policy regarding food packaging and labeling, and regarding the serving of uncut vegetables are injunctive in nature and should be dismissed because Plaintiff is no longer in ADC's custody. (Doc. #139 at 3.) The Court denied the motion, finding that Plaintiff's request regarding modifications was fairly construed as one for damages for failure to provide those modifications as well as injunctive relief as to those modifications. The Court held that although the injunctive relief is moot, the damage claims are not. (Doc. #154.)

**B.     Second Summary Judgment Motion**

Defendants now move for summary judgment on the grounds that (1) there is no individual liability under RLUIPA; (2) money damages are not available under RLUIPA; (3) claims for injunctive relief are moot; (4) Plaintiff's religious exercise was not substantially burdened; (5) Defendants did not violate Plaintiff's Free Exercise of religion under <u>Turner v. Safley</u>, 482 U.S. 78 (1987); and (6) Defendants are entitled to qualified immunity on the RLUIPA claims.

**II.     RLUIPA and Individual and Official-Capacity Claims for Damages and Claims for Injunctive Relief**

Plaintiff seeks damages and injunctive relief.  (Doc. #1 at 16.)  Defendants argue that all of Plaintiff's RLUIPA claims should be dismissed because (1) the injunctive relief is moot due to Plaintiff's release; (2) there is no individual liability under RLUIPA, so damage claims against Defendants in their individual capacity fail; and (3) damage claims against Defendants in their official capacity are barred by the Eleventh Amendment.  (Doc. #152 at 4-7.)  Plaintiff filed no response.

As discussed below, the Court finds that Plaintiff cannot bring individual or official-capacity damage claims under RLUIPA and the claims for injunctive relief are moot.  Therefore, the Court will dismiss all RLUIPA claims.

**A.     Injunctive Relief**

Plaintiff was released to his term of community supervision on May 24, 2007.  Because Plaintiff has been released from custody, his request for injunctive relief is now moot.  <u>See</u> <u>Rhodes v. Robinson</u>, 408 F.3d 559, 566 n.8 (9th Cir. 2005) (prayers for injunctive relief are mooted by a prisoner's release or transfer to another facility).

**B.     Individual Liability for Damages**

**1.     Defendants' Contentions**

Defendants argue that although RLUIPA created a private cause of action for inmates whose free exercise rights are violated, the statute was not intended to create a private cause of action against prison officials in their individual capacity.  <u>Sossamon v. Lone Star State</u>

of Texas, 560 F.3d 316, 328-29 (5th Cir. 2009); see also Hale O Kaula Church v. Maui Planning Comm'n, 229 F. Supp. 2d 1056, 1067 (D. Haw. 2002); Boles v. Neet, 402 F. Supp. 2d 1237, 1241 (D. Colo. 2005).  (Doc. #152 at 4.)

Defendants also argue that if the Court concludes that Defendants may be sued in their individual capacities, Plaintiff must prove that the Defendants acted intentionally, as opposed to negligently.  See Lovelace v. Lee, 472 F.3d 174, 194, 196 (4th Cir. 2006) (Prison officials did not act with requisite degree of culpability to be liable in their individual capacities under RLUIPA where, at most, they acted negligently.)  (Doc. #152 at 4.)

### 2.    Analysis

The only Courts of Appeals to have squarely addressed this issue—the Fifth, Seventh, and the Eleventh Circuits—have held that RLUIPA does not create a cause of action for damages against individuals.  Sossamon, 560 F.3d at 328-29; Nelson v. Miller, 570 F. 3d 868, 889 (7th Cir. 2009); Smith v. Allen, 502 F.3d 1255, 1272 (11th Cir. 2007).  The Third Circuit has declined to address the issue.  Brown v. Dep't of Corr., 265 Fed.Appx. 107, 111 n. 3 (3d Cir.2008) (per curiam) (unpublished) ("We also find it unnecessary to reach the questions whether individuals may be liable for monetary damages under the RLUIPA and whether qualified immunity applies here.").  The Fourth Circuit noted a split in the district courts over the issue, but did not resolve it.  Madison v. Virginia, 474 F.3d 118, 130 n. 3 (4th Cir.2006).  And as the Fifth Circuit noted in Sossamon, 560 F. 3d at 327 n.23, "[t]he Ninth Circuit appears to have assumed that a cause of action for monetary relief against state actors in their individual capacities exists, but its cases contain no analysis and are unpublished," citing Campbell v. Alameida, 295 Fed. Appx. 130, 131 (9th Cir.2008) (mem.) (unpublished); Von Staich v. Hamlet, Nos. 04-16011 & 06-17026, 2007 WL 3001726, at *2 (9th Cir. Oct. 16, 2007) (mem.) (unpublished).  In addition, in Shakur v. Schriro, 514 F.3d 878 (9th Cir. 2008), the Ninth Circuit  reversed a grant of summary judgment in a case involving several defendants sued in their individual capacities, and in Warsoldier v. Woodford, 418 F.3d 989 (9th Cir. 2005), the court reversed the denial of injunctive relief.  See also Greene v. Salano

County Jail, 513 F.3d 982, 986 (9th Cir. 2008); Alvarez v. Hill, 518 F.3d 1152, 1156-57 (9th Cir. 2008).

RLUIPA creates a cause of action for suits against "a government"; government is defined as "(i) a State county, municipality, or other governmental entity created under the authority of a State; (ii) a branch, department, agency, instrumentality, or official of an entity listed in [that] clause . . . ; and (iii) any other person acting under color of state law. . . ." 42 U.S.C.§ 2000cc-5. As the court in Sossamon noted, this language appears to create a right against state actors in their individual capacities and it even mirrors the "under color of" language in § 1983. 560 F. 3d at 327-28. But the Fifth, Seventh and Eleventh Circuits nevertheless held that individuals may not be sued for damages under RLUIPA. The Eleventh Circuit reasoned that RLUIPA was enacted pursuant to Congress's Spending Clause power, not pursuant to the Section 5 power of the Fourteenth Amendment, citing Cutter v. Wilkinson, 544 U.S. 709, 715-16 (2005), and that Spending Clause legislation is not legislation in its operation but operates like a contract, see Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981). Smith, 502 F.3d at 1273-75. Individual RLUIPA defendants are not parties to the contract in their individual capacities, and therefore, only the grant recipient—that is, the state—may be liable for its violation. Id. The Fifth Circuit also concluded that RLUIPA was passed pursuant to the Spending Clause and noted that it also followed the same rule for Spending Clause legislation. Sossamon, 560 F.3d at 328-29. Likewise, the Seventh Circuit reasoned that "[c]onstruing RLUIPA to provide for damages actions against officials in their individual capacities would raise serious questions regarding whether Congress had exceeded its authority under the Spending Clause," and so the court declined to read RLUIPA as allowing damages against defendants in their individual capacities. Nelson, 570 F. 3d at 889.

In Mayweathers v. Newland, 314 F.3d 1062, 1066-70 (9th Cir.2002), the Ninth Circuit held that RLUIPA is constitutional under the Spending Clause. As the Seventh Circuit noted

[a]lthough RLUIPA ostensibly includes Commerce Clause underpinnings as well, see 42 U.S.C. § 2000cc-1(b), there is no evidence in this case that [the] denial of a religious diet 'affect [ed] . . . commerce with foreign nations, among the several States, or with Indian tribes.' Id. Thus, it strikes us as

appropriate, at least in this case, to interpret RLUIPA as an exercise of Congress's power under the Spending Clause.

Nelson, 570 F. 3d at 886 (citing Smith, 502 F.3d at 1274 n. 9 (reasoning that RLUIPA should be analyzed as an exercise of Congress's Spending Clause authority when there is no evidence of an effect on interstate or international commerce)); Sossamon, 560 F.3d at 328 n. 34 (same).

Likewise, here, Plaintiff's claims do not appear to implicate the Commerce Clause, and so the Court interprets RLUIPA as a Spending Clause enactment, which operates like a contract with the state, not individual employees of the state. See Pennhurst State Sch. & Hosp, 451 U.S. at 17. For the reasons discussed by the Fifth, Seventh, and Eleventh Circuits, the Court will dismiss Plaintiff's individual damage claims under RLUIPA.

### C. Official-Capacity Claims for Damages

#### 1. Defendants' Contentions

As to official-capacity claims, Defendants assert that although RLUIPA provides that "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), the term "appropriate relief" is not statutorily defined and is not broad enough to waive the state's sovereign immunity from money damages. (Doc. #154 at 4-6.) Defendants assert that the Eleventh Amendment precludes citizens from bringing suit against their own state in federal court. They note there are exceptions to the broad grant of sovereign immunity—Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment, College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999)(citations omitted); a State may waive its sovereign immunity by consenting to suit, id.; and a suit may be brought to enjoin a state official under Ex Parte Young, 209 U.S. 123 (1908), although that exception does not permit a suit for monetary damages, see Miranda B. v. Kitzhaber, 328 F.3d 1181, 1187-89 (9th Cir. 2003). (Doc. #152 at 5.)

Defendants further assert that RLUIPA was enacted by invoking congressional authority under the Spending and Commerce Clauses, citing Cutter, 544 U.S. at 715. They

argue that Congress cannot abrogate Eleventh Amendment immunity pursuant to the Spending and Commerce Clauses, see Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 72-73 (1996), and that as to damages, RLUIPA can only avoid the effect of the Eleventh Amendment if the State has waived its immunity by consenting to suit. (Doc. #152 at 5.)

Defendants contend that although the circuit courts have agreed that RLUIPA conditions federal funds on a waiver of immunity, they have split on whether it provides for damages.[3] (Id. at 5-6.) The Eleventh Circuit followed the general rule that courts should presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise. Smith v. Allen, 502 F.3d 1255, 1270 (11th Cir. 2007) (citing Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992)). But the Fourth and Fifth Circuits have held that a suit for damages is not available under RLUIPA, concluding that RLUIPA does not clearly alert a state that it will waive sovereign immunity for damage actions by accepting federal funding. See Sossamon, 560 F.3d at 331; Madison, 474 F.3d at 131-133.

Defendants assert that although the Ninth Circuit has not directly addressed the issue of RLUIPA and monetary damages, the issue was recently addressed in Williams v. Beltran, 569 F. Supp.2d 1057, 1063-65 (C.D. Cal. 2008), where the court followed the Fourth Circuit and held that RLUIPA cannot provide monetary damages because it does not provide unambiguous notice of states' waiver of immunity regarding damages. (Doc. #152 at 6.) The court stated

> [t]he phrase 'appropriate relief' is ambiguous, and does not provide the express language or overwhelming implication that waiver of sovereign immunity requires. The ambiguity of this phrase is only corroborated by the disagreement of the Fourth and Eleventh Circuits in interpreting its language. We conclude that a State need not submit to all remedies merely because it waives its immunity to some forms of relief by receiving federal funds.

Williams, 569 F.Supp.2d at 1061. The court in Williams viewed Smith's reliance on Franklin as inapposite because Franklin involved a suit against a local government, where sovereign immunity does not apply. Id. at 1061-62.

---

[3]Defendants state that the Court should assume, for purposes of this motion, that they receive federal funds. (Doc. #152 at 5, n.3.)

Thus, Defendants argue that under the rationale in <u>Sossamon</u>, <u>Madison</u>, and <u>Williams</u>, Plaintiff may only seek injunctive relief for RLUIPA violations; that is, accepting federal funds does not constitute a waiver of Eleventh Amendment sovereign immunity regarding damages.  (Doc. #152 at 6.)

## 2. Analysis

The majority of Courts of Appeals to have considered this issue have held that official-capacity suits for damages for violations of RLUIPA are barred by the Eleventh Amendment.  Specifically, the Third Circuit in <u>Scott v. Beard</u>, 252 Fed. Appx. 491, 492-93 (3d Cir. 2007); the Fourth Circuit in <u>Madison</u>, 474 F. 3d at 131; the Fifth Circuit in <u>Sossamon</u>, 560 F. 3d at 331; the Sixth Circuit in <u>Cardinal v. Metrish</u>, 564 F. 3d 794, 801 (6th Cir. 2009); and the Seventh Circuit in <u>Nelson</u>, 570 F.3d at 885, have all held that there has been no waiver of sovereign immunity for damage suits under RLUIPA.  The only Circuit to disagree is the Eleventh in <u>Smith</u>, 502 F. 3d at 1276.

It is clear that by voluntarily accepting federal correctional funds, the state consented to federal jurisdiction for at least some form of relief.  <u>See</u> <u>Madison</u>, 474 F.3d at 130; <u>Benning v. Georgia</u>, 391 F.3d 1299, 1306 (11th Cir. 2004) ("[State] was on clear notice that by accepting federal funds for its prisons, [it] waived its immunity from suit under RLUIPA.").  But that does not resolve the issue of the state's liability for money damages.  Congress can condition funds upon a waiver of "sovereign immunity against liability without waiving [a State's] immunity from monetary damages awards." <u>Madison</u>, 474 at 131 (citing <u>Lane v. Pena</u>, 518 U.S. 187,196 (1996); <u>United States v. Nordic Vill., Inc.</u>, 503 U.S. 30, 32-34 (1992).

"In considering whether the Eleventh Amendment applies, . . . cases involving the sovereign immunity of the Federal Government . . . provide guidance." <u>California v. Deep Sea Research, Inc.</u>, 523 U.S. 491, 506 (1998).  When determining whether a sovereign has waived its immunity, courts must strictly construe the scope of any alleged waiver in favor of the sovereign. <u>Lane</u>, 518 U.S. at 192.  A court may "not enlarge the waiver beyond what the language requires." <u>Library of Congress v. Shaw</u>, 478 U.S. 310, 318 (1986) (internal

citations and quotations omitted) (superceded by statute on other grounds as recognized in D'Ambrosio v. Bagley, 527 F.3d 489, 495 n.4 (6th Cir. 2008)). Consent to suit is never implied. See Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 247(1985) (superceded by statute on other grounds). And ambiguities are construed in favor of immunity. Nordic Vill., 503 U.S. at 34. "In short, '[t]o sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims.'" Madison, 474 at 131 (quoting Lane, 518 U.S. at 192; see also Nordic Vill., 503 U.S. at 34).

As the Fourth Circuit stated, that "RLUIPA's 'appropriate relief against a government' language falls short of the unequivocal textual expression necessary to waive State immunity from suits for damages." Madison, 474 F.3d at 131; see Sossamon, 560 F. 3d at 331; Cardinal, 564 F.3d at 18; Nelson, 570 F.3d at 884-85. And as the court in Madison noted, RLUIPA makes no reference to monetary relief—or even to sovereign immunity generally, and "appropriate relief" is "susceptible to more than one interpretation." Madison, 474 F.3d at 131. If Congress intended to effect a State's waiver of Eleventh Amendment sovereign immunity from suit for damages as a consequence of accepting federal funds, it could easily have expressed that intention; for example, the Civil Rights Act of 1991, 42 U.S.C. § 1981a(a)(2) (2000), contains a clear waiver of federal sovereign immunity from monetary relief, providing for federal jurisdiction and permitting a "complaining party [to] recover compensatory . . . damages" from, inter alia, government actors. Madison, 474 F.3d at 131, citing 42 U.S.C. § 1981a(a)(2).

Finally, the Sixth Circuit recently considered the Eleventh Circuit's holding in Smith, which found a waiver of sovereign immunity. Cardinal, 564 F.3d at 800-01. In Cardinal, the court reasoned that Franklin,503 U.S. 60, on which the Smith court relied, was not applicable to a claim against a State for money damages under RLUIPA. "Franklin did not involve a claim of sovereign immunity. The Supreme Court has recognized that Franklin is not per se applicable to all claims against a State, but only to claims in which a State has expressly waived its sovereign immunity." Cardinal, 564 F.3d at 800-01 (citing Lane, 518

- 10 -

U.S. at 196-97) (finding that Congress did not waive federal government's sovereign immunity for monetary damages for claims against it for violations of § 504(a) of Rehabilitation Act of 1973)).

This Court is persuaded that the language of RLUIPA, which allows for "appropriate relief against the government," does not provide a clear waiver of sovereign immunity as to damage claims against Defendants in their official capacity. These damage claim will be dismissed.

## III. Legal Standards

### A. Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Rule 56(e) compels the non-moving party to "set forth specific facts showing that there is a genuine issue for trial" and not to "rest upon the mere allegations or denials of [the party's] pleading." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). However, Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. Celotex, 477 U.S. at 322-23.

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. But, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. Id. at 249-50.

**B.    First Amendment**

The First Amendment provides in relevant part that the government shall not prohibit the free exercise of religion. U.S. Const. amend. I. Nevertheless, free-exercise rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." O'Lone v. Shabazz, 482 U.S. 342, 348 (1987). To show that his First Amendment right to free exercise of religion has been violated, a prisoner must demonstrate a burden to a sincerely held belief that is rooted in religion. Shakur, 514 F.3d at 884. To substantially burden the practice of an individual's religion, the interference must be more than an inconvenience, Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997), or an isolated incident or short-term occurrence, see Canell v. Lightner, 143 F.3d 1214, 1215 (9th Cir. 1998) (interference that is relatively short-term and sporadic was not substantial). The Ninth Circuit has held that inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." Ward v. Walsh, 1 F.3d 873, 877 (9th Cir. 1993.)

"When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89-91. To determine whether a regulation or policy is reasonably related to a legitimate penological interest, the court must consider: (1) if there exists a valid, rational connection between the prison regulation and the legitimate governmental interest put forth to justify it; (2) whether there are alternative means of exercising the regulated right that remain open to the inmate; (3) the impact that accommodation of the asserted constitutional right will have upon guards, other inmates, and prison resources; and (4) whether there exist ready alternatives that fully meet the inmate's demands at a *de minimis* cost to valid penological interests. Id.

In addition, to prevail on any § 1983 claim, a plaintiff must demonstrate that he suffered a specific injury as a result of specific conduct of a defendant and show an affirmative link between the injury and the conduct of that defendant. Rizzo v. Goode, 423 U.S. 362, 371-72, 377 (1976). In other words, a particular defendant's liability under § 1983 only exists where a plaintiff makes a showing of personal participation by the defendant in the alleged violation. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). There is no *respondeat superior* liability under § 1983. Id.

**IV.    Motion for Summary Judgment on the Remaining First Amendment Claims**

With the RLUIPA claims dismissed, the Court turns to the summary judgment motion regarding the remaining First Amendment claims.

**A.    Requests for Modifications to Kosher Diet Policy**

As previously stated, Defendants' first motion for summary judgment on the First Amendment claims was denied as to some claims, including claims for damages for failure to modify the kosher diet policy regarding food packaging and labeling and regarding the serving of uncut vegetables. The Court found that it could not determine on the record before it whether ADC would prevail on the third factor under Turner, 482 U.S. at 89-9: the impact that accommodation of the asserted constitutional right would have upon guards, other inmates, and prison resources. Plaintiff asks for "kosher food in approved recognized

- 13 -

original kosher packaging only, unopened by [ADC] staff with [specified kosher symbols] on their packages. . . . Vegetables untouched by staff in any manner that I can wash myself." (Doc. #1 at 16 .)  In addition to complaining that packets of salt and condiments do not have kosher labels,  Plaintiff complained about the use of bulk food items, such as Cherrio-style cereal, that are also used for GP inmates.  Plaintiff also alleged that whole vegetables needed to be washed uncut, but that carrots, onions, celery, other vegetables were cut and "ruined." The Court treated these complaints as requests for modifications to the policies for preparation of kosher meals and analyzed them under <u>Turner</u>.

Defendants now present additional evidence as to these matters.

### 1.    Defendants' Contentions

In support of their motion, Defendants submit their Statement of Facts (Doc. #153 (DSOF)) and the declarations of Linderman (<u>id.</u>, Ex. A, Linderman Decl.), Johnson (<u>id.</u>, Ex. B, Johnson Decl.), Suwinski (<u>id.</u>, Ex. C, Suwinsk Decl.), Rabbi Joseph Shemtov (<u>id.</u>, Ex. D, Shemtov Decl.), Alan Wesley, Eastern Regional Operations Manager for Arizona Correctional Industries, a division of ADC (<u>id.</u>, Ex. E, Wesley Decl.), Mark Horneffer (id., Ex. F. Horneffer Decl.), Tamatha Brown, who operates Capital Center Deli (<u>id.</u>, Ex. G, Brown Decl.), and Malinda Strom, Contracts Monitor/Commissary Food Division (<u>id.</u>, Ex. H, Strom Decl.).

Defendants assert that the changes requested by Plaintiff would have a clear impact on ADC and other inmates. They argue that for security reasons—the potential for introducing contraband into the prison—ADC does not permit inmates to purchase food from outside sources.  (Doc. #152 at 19-20, ref. Doc. #61, Affidavit of Edwin Lao, Chief of Security for Florence Complex ¶ 3.)  Defendants assert that vegetables served by ADC are washed and if they require cutting—such as cabbages, onions, green peppers, whole zucchini or cucumber, they are cut in the kitchen with a kosher cutting utensil and double wrapped in plastic wrap.  (DSOF ¶ 53.)  Rabbi Shemtov attests that this practice does not violate Kashruth. (Shemtov Decl. ¶ 9.) Defendants also submit evidence that they previously served whole vegetables on the kosher menu that but inmates complained that they were unable to

cut these items and, therefore, were unable to consume them.  (DSOF ¶ 54, Linerman Decl. ¶ 11.)

Defendants also assert that there would be a significant increase in the cost of kosher meals if Canteen discontinued the use of bulk kosher items in the meals and used only individually packaged items.  They provide, as an example, evidence of the cost of purchasing bulk Cherrio-style toasted oats compared to the cost of purchasing individual servings.  Defendants calculate the bulk cost as $.06.5 per ounce.  (DSOF ¶ 90.)  They calculate the cost of individual servings purchased from a wholesaler as $.43 per item/ounce for a 1 ounce size and $.92 per item and $.37 per ounce for a 2.5 ounce size.  (Id. ¶ 89, Brown Decl. ¶¶ 4-5.)  Defendants assert that Canteen has advised ADC staff that the kosher menu items are conservatively 25 to 30% cheaper when purchased in bulk rather than in individual serving sizes.  (DSOF ¶ 93, Strom Decl. ¶ 7.)  Defendants contend that this is evident by the $.36.5 per ounce difference between the bulk purchase ($.06.5 per ounce) and the individual container purchase ($.43 per ounce).  They argue that this cost is for only one item on the kosher diet menu that is purchased in bulk.  (Doc. #152 at 17.)

Defendants further assert that ADC is on a fixed budget and the State is currently running a significant budget deficit, which will require budget cuts.  (DSOF ¶ 94.)  They argue that cost to ADC of changing the kosher-diet meals to include individual serving sizes for each kosher-diet meal would be grossly prohibitive; in 2008 there were 1,965 approved kosher diets, and the kosher-meal price per meal, per inmate is already the most expensive diet offered by the ADC at $2.2638, compared to $1, 336 for non-kosher meals.  (DSOF ¶¶ 91-92, 94, Strom Decl. ¶ 8.)  Defendants also contend that because there is a fixed budget, the extra monies needed to change the kosher diet meals to include individually packaged servings would have to come out of the general food budget for all inmates and would have a direct impact on the monies that would be available to pay for non-kosher inmate meals. Defendants argue that the third Turner factor weighs in their favor.

## 2. Plaintiff's Contentions

As stated, Plaintiff did not respond to Defendants' motion. Because a verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence, the Court will consider the allegations set forth in Plaintiff's Complaint. Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995). As to these matters, in his Complaint, Plaintiff generally alleged that he was regularly served non-kosher items, such as packets of salt, pepper, and salad dressing. (Doc. #1 at 6-7.) He alleged that bulk items were replaced with non-kosher items or baggies without any labeling. He also complained that whole vegetables need to be washed uncut, but that carrots, onions, celery, other vegetables were cut and "ruined." (Id.)

The Court will also consider the allegations in the response to the first summary judgment motion. (Doc. #133.) There, Plaintiff essentially repeated the assertions in his Complaint and did not address the impact of the accommodations. (Id.)

## 3. Analysis

The Court will grant Defendants summary judgment regarding Plaintiff's claims for damages for failure to provide the requested modifications to its kosher-diet meals. The Court previously found that the first and second Turner factors—a rational relationship between food policies and legitimate governmental interests and the availability alternative means of exercising the right—weigh in favor of Defendants.[4] (Doc. #138 at 15-16.) With this second motion, Defendants provide evidence as to the third Turner factor—the impact of the requested accommodations. Specifically, the evidence shows that they looked into providing uncut vegetables and the purchase of non-bulk, individually packaged food items and determined what effect those accommodations would have on other inmates and on ADC operating expenses. As to the request for uncut vegetables, the record shows that when ADC tried serving vegetables uncut, other inmates complained that they could not eat them because they could not cut them, and the Court finds there is an obvious security risk in

---

[4]The Court also previously found that Plaintiff offered no ready alternatives, the fourth Turner factor. (Doc. #138 at 17.)

allowing inmates utensils for cutting. Plaintiff does not dispute that other inmates complained about the uncut vegetables nor does he offer any "ready alternatives" to the prison's current policies that would accommodate Plaintiff at a *de minimis* cost to the prison, the fourth <u>Turner</u> factor. <u>See</u> <u>Ward</u>, 1 F.3d at 879; <u>O'Lone</u>, 482 U.S. at 350 (burden on this factor is on the plaintiff).

As to the costs of providing individually packaged foods, Defendants have provided evidence from the ADC Contract Monitor/Commissary Food Division regarding the cost of kosher-diet meals and the relative costs of purchasing items in bulk compared to individually packaged. The evidence, which Plaintiff does not dispute, shows that individually packaged items are significantly more expensive than bulk purchase items, that ADC operates on a fixed budget, and that purchase of individually packaged foods would greatly increase the costs of these foods. These increased costs would come out of the general food budget for all inmates and would have a direct impact on the monies that would be available to pay for non-kosher inmate meals. The Court notes that Plaintiff does not claim that Kashruth requires that foods be separately packaged. The Court finds that on this record, the third <u>Turner</u> factor weighs in Defendants' favor.

Thus, the four <u>Turner</u> factors weigh in Defendants' favor, and they are entitled to summary judgment on the First Amendment claims for damages regarding failure to modify the ADC kosher-meals policy.

## B. Deviations From Valid Policies

As to Plaintiff's claims that Defendants deviated from their own kosher-meal policies, the Court denied the summary judgment motion regarding allegations that, in violation of ADC policies, Plaintiff was served meat and cheese items together and that he saw food items being prepared without saran barriers between the food and counter tops. (Doc. #138 at 20.) Defendants now assert that to the extent that Plaintiff alleged that Defendants acted negligently in following valid policies, he fails to state a claim. (Doc. #152 at 18, n.4.)

The Court agrees that an allegation of negligence would not state a claim cognizable under § 1983. <u>See</u> <u>Daniels v. Williams</u>, 474 U.S. 327, 330-31 (1986); <u>Covenant Media of</u>

S.C., LLC v. City of North Charleston, 493 F.3d 421, 436 (4th Cir. 2007). In Covenant Media, the Fourth Circuit held that negligent failure to act on the plaintiff's application to construct a billboard was not a violation of the First Amendment. However, the court noted that if Covenant had called, written, or emailed the City to inquire about the status of the application and the City still refused to respond, such refusal may have established that the City intentionally refused to act on the application or was deliberately indifferent to the consequence of having a sign regulation that lacked procedural safeguards. Id. at 437.

The Court finds that fairly construed, Plaintiff is not alleging negligence.

Defendants also assert that they were administrators who were not involved in meal preparation or distribution and that they did not substantially burden Plaintiff's religious exercise.[5] (Doc. #152 at 11.)

Specifically, Defendants assert that as the Administrator of Pastoral Activities, Linderman's involvement with the kosher diet is to confirm with Rabbi Shemtov that foods to be served and the procedures to prepare and serve the foods comply with kosher dietary standards. (DSOF ¶¶ 42, 55.) Linderman attests that his job duties do not include inmate food service preparation, supervision, or distribution. (Linderman Decl. ¶ 4.)

Defendants further contend that, as the Deputy Warden, one of Johnson's duties was overseeing food services. (DSOF ¶ 11.) They assert that he conducted weekly meetings with the Canteen Manager, toured the chow hall and kitchen, and monitored and sampled meals and that approximately twice a week, he took a tray off the inmate food line and sat and ate with the inmates. (Id. ¶¶ 11, 13.) He evaluated the meal for its portion size, appearance, taste, and quality. (Id.) Johnson attests that his duties did not include ordering the food items for inmate meals, participating in the meal preparation, supervising the meal preparation, or supervising meal distribution. (Johnson Decl. ¶ 4-5.) Defendants also assert

---

[5]The Court previously dismissed Schriro and Bartos as to claims that Plaintiff's First Amendment rights were violated by service and preparation of food in violation of ADC policies. (Doc. #138 at 20.) Because the claims for damages for failure to modify the Kosher-diet policy will be dismissed and the RLUIPA claims and all injunctive relief will be dismissed, no claims remain against them.

that he did not ignore Plaintiff's allegations; for example, Plaintiff complained that the kosher diet was being prepared by inmates, and, to investigate, Johnson toured and conducted surprise inspections of the Bachman Kitchen. (DSOF ¶ 71.) They contend that kosher meals were always prepared by Canteen staff. (Id.)

Defendants assert that Suwinski, as Contract Management Specialist II at the ASPC–Lewis, was the liaison between ADC and Canteen; however, her duties did not include ordering the food items for inmate meals, participating in the meal preparation, supervising the meal preparation, or supervising meal distribution. (Id. ¶¶ 14-15, Suwinski Decl. ¶¶ 3-4.) She attests that her duty was to monitor the contract with Canteen and insure that Canteen was following kosher preparations. (DSOF ¶ 16, Suwinski Decl. ¶ 5.) She conducted monthly inspections to make sure kosher standards were being followed. (Id.) She also addressed issues concerning diets as they were raised by the inmates. (Id.) If there was a problem with an inmate's meal tray, Suwinski advised Canteen personnel of the issue for them to address. (Id. ¶ 69.) Defendants assert that it was not her duty, as a Contract Management Specialist II, to replace the meal. (Id.) Defendants further assert that Suwinski was not at the Bachman Unit on a daily basis; her office was located in the Lewis Complex Business office. (Id. ¶ 17.)

Plaintiff did not respond. Plaintiff's allegations in the Complaint as to these Defendants are that Linderman misidentified registered trademark symbols for kosher symbols as did . . . Johnson when specifically confronted." He asserts that Johnson has "primary responsibility to supervise the complainee." (Doc. #1 at 8.) As to Suwinski, Plaintiff asserted that when she was shown unkosher packs of relish, she had an inmate get the box, which was marked kosher but "it was for [Heinz] relish packs no longer handed out." (Id. at 7.) Plaintiff also reasserted these allegations in his response to the first motion for summary judgment. (Doc. #133.) In that response, Plaintiff complained that Johnson's understanding of Kashruth was limited to the idea that food had to be blessed by a rabbi and he had "no clue as to the mixing of milk and meat items as a major sacrilege nor did he understand the biblical laws and significance of Kashruth." (Id. at 2-3.) Plaintiff also

alleged that he had an exchange with Suwinski concerning a regular problem of substituting unkosher small hotdogs for kosher knockwurst. (Id. at 3.) He also asserted that the parties' responses to grievances were that Plaintiff was wrong or that his concerns had been addressed. (Id. at 7.) Plaintiff contended that Johnson stated that kosher food is blessed and that he saw nothing wrong in the use of pastry that had no pork in it and that Suwinski saw nothing wrong in using non-kosher cheaper tuna "because of a new revolutionary concept not included anywhere in Jewish dietary law kosher by nature." (Id. at 8.)

The Court will dismiss Linderman, Johnson, and Suwinski. They assert that their job duties do not included, among other things, supervising the meal preparation or supervising meal distribution. To prove a valid claim under § 1983, a plaintiff must prove that he suffered a specific injury as a result of specific conduct of a defendant and show an affirmative link between the injury and the conduct of that defendant. Rizzo, 423 U.S. at 371-72, 377. There is no respondeat superior liability under § 1983, and, therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability. Monell v. New York City Department of Social Services, 436 U.S. 658, 691-92. (1978). "In a § 1983 suit or a Bivens action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Moreover, the Supreme Court specifically rejected the notion that a supervisor's knowledge of a subordinate's wrongdoing amounts to the supervisor's violation of the Constitution. Id.

Here, the undisputed evidence is that Linderman had no involvement in kosher-diet matters except to confirm with the Rabbi that foods to be served and the procedures to prepare and serve the foods complied with kosher dietary standards. The evidence also shows that Johnson duties were to generally oversee food services. Likewise, although Suwinski asserts that it was her duty to insure that Canteen was following Kosher meal preparations, she also asserts that she did not supervise meal preparation or distribution and

that she was not present in the Bachman kitchen on a daily basis. Because Plaintiff does not dispute these assertions, there is no evidence that Johnson or Suwinski had anything other than a supervisory role, which, by itself, is insufficient for liability. <u>See</u> <u>Iqbal,</u> 129 S. Ct. at 1949. And Plaintiff's evidence does not establish any Defendant's intent to violate Plaintiff's First Amendment rights. Defendants are entitled to summary judgment on the remaining claim.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. #152). All other matters will remain with the Magistrate Judge.

(2)     Defendants' Motion for Summary Judgment (Doc. #152) is **granted.**

(3)     The action is terminated with prejudice, and the Clerk of Court must enter judgment accordingly.

DATED this 11th day of August, 2009.

_____
G. Murray Snow
United States District Judge